# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

LORIE ANN BODFIELD,

        **Plaintiff,**

                                        **Civil Action 2:18-cv-536**
                                        **Judge James L. Graham**
      **v.**                                 **Magistrate Judge Chelsey M. Vascura**

COMMISSIONER OF SOCIAL SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Lorie Ann Bodfield ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (19), and the administrative record (ECF No. 8). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff filed her application for disability insurance benefits on July 28, 2014, alleging disability since November 14, 2013. (R. at 174.) Plaintiff's application was denied initially and upon reconsideration. (R. at 59-86, 87-100.) Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Eric Westley (the "ALJ") held a hearing on April 13, 2017, at which Plaintiff, represented by counsel, appeared and testified. (R. at 30-56.)

On April 28, 2017, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 12-29.) On April 12, 2018, the Appeals Council denied Plaintiff's request for review and affirmed the ALJ's decision. (R. at 1-6.) Plaintiff timely filed this action for review. (ECF No. 1.)

Plaintiff advances three errors in her Statement of Errors. Specifically, Plaintiff asserts that remand is required because (1) the ALJ failed to find that Plaintiff had a severe impairment as a result of pain in her right foot and elbow; (2) the ALJ failed to appropriately weigh the medical source opinions; and (3) the ALJ's decision is not supported by substantial evidence. The undersigned limits her discussion of the record to evidence bearing on these contentions of error.

## II.    RELEVANT RECORD EVIDENCE

### A.    Treating Providers

#### 1.  Holzer Clinic

Plaintiff first visited Holzer Clinic at its urgent care center on May 25, 2014, with complaints of right ankle pain secondary to rheumatoid arthritis. Dr. Kristy Blum examined Plaintiff and noted that she was able to ambulate without assistance, although Plaintiff complained that weight bearing and walking exacerbated the pain. Dr. Blum noted an absence of swelling. She noted tenderness of the right foot midfoot and normal range of motion in the foot and ankle. An x-ray of Plaintiff's foot demonstrated no obvious fracture and mild osteoarthritic changes. Plaintiff was prescribed medication.

On June 10, 2014, Plaintiff saw Dr. Penny Shelton of Holzer Clinic as a new patient for purposes of establishing a new primary care physician relationship. Plaintiff complained of pain

in her hands, feet, elbows and knee, which she rated at a level 4 on a 10-point scale. Plaintiff reported that she recently moved from Nevada and stated she "works in retail with setting up displays." (R. at 358.) She indicated that her boyfriend was in college and that the two "plan to live here [in Ohio] 1.5 years and then travel the world." (*Id.*) Plaintiff reported that she had tried a certain medication for rheumatoid arthritis in the past, "but developed neuropathy severe so it was stopped." (*Id.*) She reported she still has numbness in the fingers and toes from trying that medication. On physical exam, Dr. Shelton observed Plaintiff to be alert and oriented with appropriate mood and affect with no tenderness of the neck. Plaintiff demonstrated full range of motion in all four extremities and no muscle atrophy. Her gait was normal and she had no lower extremity edema. Dr. Shelton prescribed medications and encouraged a nutrition approach to address Plaintiff's chronic pain.

Plaintiff visited Dr. Julie C. Lew on June 18, 2014, with complaints that her vision had become blurry, which she attributed to the failed medication attempt that caused her neuropathy. Plaintiff indicated that she had taken Remicade for rheumatoid arthritis, but stated that she "now only takes herbals and vitamins for symptoms." (R. at 355.)

Plaintiff saw Dr. Shelton on June 25, 2014, to discuss recent lab results. Plaintiff reported her pain to be at a level 4 on a 10-point scale. Dr. Shelton discussed lab work and instructed Plaintiff to return in three months.

Plaintiff saw Dr. David C. Blevins at Holzer Clinic on June 27, 2014, with complaints of knots in her elbows secondary to rheumatoid arthritis. Dr. Blevins noted "about a 3-4 cm size around smooth, subcutaneous mass, consistent with either a lipoma or a fluid collection, like a bursitis." (R. at 349.) Plaintiff stated that this "gives her a little discomfort." (*Id.*) Dr. Blevins

instructed Plaintiff to consult an orthopedic surgeon to determine whether these were bursitis, in which case he would excise them.

Plaintiff saw Patricia L. DeBruin, CNP, at Holzer Clinic on July 3, 2014, to examine the nodules in her elbows, which she reported were causing "daily discomfort." On exam, Plaintiff demonstrated an ability to fully extend the right elbow with a lack of a few degrees in her ability to extend the left elbow. Nurse DeBruin noted good flexion on both elbows. Nurse DeBruin suggested Plaintiff follow up with Dr. Blevins to discuss surgical removal of the nodules.

Plaintiff followed up with Dr. Blevins on July 15, 2014, at which time Dr. Blevins noted that Plaintiff had nodules under each elbow due to rheumatoid arthritis and scheduled surgery. (R. at 342.) On July 25, 2014, Dr. Blevins performed surgery on Plaintiff's right elbow to remove the nodules.

Plaintiff saw Dr. Blevins again on August 12, 2014, for follow up and reported that "she feels that the elbow was much improved and is pleased with the outcome." (R. at 336.) Dr. Blevins reported that Plaintiff "wishes to proceed with the same procedure on the other side." (R. at 336.) He indicated he would schedule the surgery.

Plaintiff saw Dr. Shelton on August 14, 2014, with complaints of pain and edema in the right foot since May. Dr. Shelton noted that previous an x-ray of Plaintiff's foot revealed osteoarthritis and that Plaintiff now reported worsening pain. Plaintiff complained of pain when standing on her foot, though she also reported that it "sometimes does not hurt." (R. at 334.) Plaintiff reported that it "[h]urts on the top of the foot when lifting it a certain way," and said she "[d]oes not think this feels like her [rheumatoid arthritis]." (R. at 334.) Plaintiff presented in a wheelchair and was noted to have right foot swelling on exam, with no tenderness in the heel, no

erythema and no warmth. Dr. Shelton ordered an MRI of the right foot with instructions to follow up in one month.

Plaintiff underwent an MRI of the right foot on August 29, 2014, which revealed a fluid collection in her foot likely secondary to rheumatoid arthritis, soft tissue edema throughout the foot and bone marrow edema about the distal portion of the 5th toe, and a boney deformity secondary to rheumatoid arthritis.

On September 3, 2014, Dr. Blevins surgically removed the rheumatoid nodules in Plaintiff's left elbow.

Plaintiff saw Seth A. Kearney, D.P.M., of Holzer Clinic on September 10, 2014, with complaints of right foot pain and edema since May. Plaintiff complained that "this pain is different because her [rheumatoid arthritis] pain gets better throughout the day, whereas this pain gets worse." (R. at 328.) Plaintiff reported her pain as a level 6 on a 10-point scale. On exam, Plaintiff was observed to have decreased bilateral range of motion. Dr. Kearney also observed that Plaintiff's "[b]ilateral toes 2-5 have extension/flexion contractures," and noted a "cystic type mass soft moveable on exam" that was more than edema. (R. at 329.) Dr. Kearney observed that the August 29, 2014 MRI revealed fluid collection in the foot and administered injections to treat the cystic lesion. (R. at 331.)

Plaintiff saw Dr. Blevins again on September 19, 2014, for follow up, at which time Dr. Blevins observed that Plaintiff's surgical incision healed nicely and instructed Plaintiff to follow up as needed.

Plaintiff saw Dr. Shelton again on September 24, 2014, for a three-month recheck. On exam, Plaintiff was alert and properly oriented. Dr. Shelton observed no lower extremity edema

and full range of motion in all four extremities.  Dr. Shelton adjusted Plaintiff's medications.

Plaintiff saw Dr. Kearney on October 1, 2014, for complaints of a right ganglion. Plaintiff reported "improvement of symptoms, but [said she] has not been on her feet as much as she usually is."  (R. at 321.)  Plaintiff denied pain on walking.  Dr. Kearney recommended that Plaintiff use proper shoes and employ proper footcare.

Plaintiff saw Dr. Shelton again on October 29, 2014, with complaints of generalized joint pain due to arthritis, which Plaintiff reported to be at a level of 7 on a 10-point scale.  On exam, Plaintiff was observed to be alert and properly oriented and to have no lower extremity edema. She demonstrated normal range of motion in all four extremities.

Plaintiff saw Dr. Shelton again on January 6, 2015, for joint pain, which Plaintiff reported as an 8 on a 10-point scale.  She also reported more swelling in her hands and right knee and feet and complained of "hurting all over her body."  (R. at 315.)  Plaintiff reported that the pain medication she had been taking no longer works and asked to discuss stronger medication. Plaintiff reported her pain as 5 on a 10-point scale.  On exam, Dr. Shelton noted Plaintiff to be alert and properly oriented.  Plaintiff was in a "wheelchair today with knee brace on right knee." (R. at 317.)  Dr. Shelton observed swelling in Plaintiff's hand and knee, though she demonstrated full range of motion in all four extremities.  Dr. Shelton adjusted Plaintiff's medications.

Plaintiff saw Dr. Shelton again on April 2, 2015, at which time she complained of pain and swelling in her right knee and stated that her middle finger on her right hand loses circulation intermittently.  (R. at 312.)  Plaintiff reported her pain as a 5 on a 10-point scale.  On exam, Dr. Shelton noted Plaintiff to be alert and properly oriented.  Dr. Shelton observed swelling bilaterally in the hands and feet and in the left knee, though Plaintiff demonstrated full

range of motion in all four extremities. An x-ray of the left foot revealed moderate degenerative changes suggestive of rheumatoid arthritis and osteoarthritis. X-rays of Plaintiff's left and right hand revealed moderate degenerative changes due to rheumatoid and osteoarthritic elements. An x-ray of her knee revealed mild to moderate degenerative changes. Dr. Shelton maintained Plaintiff on medications.

Plaintiff visited Dr. Shelton again on July 17, 2015, with complaints of arthritic pain at a level of 7 on a 10-point scale. Plaintiff reported that she recently returned from vacationing in Canada where she received multiple insect bites. On exam, Plaintiff was alert and appropriately oriented. She was observed to have bilateral hand and feet swelling and swelling in the right knee, but was noted to have full range of motion in all four extremities. Dr. Shelton continued Plaintiff on medications with instructions to return in three months for a checkup.

Plaintiff saw Dr. Sheila Whitley of Holzer Clinic on October 14, 2016, with complaints that she injured her right knee in August when she twisted and heard a pop, and that she separately injured her left ankle around that time when she slid off the bed and hit her feet on the floor. Plaintiff reported that she initially thought the pain was secondary to a flare-up of her rheumatoid arthritis, but said that the pain has persisted despite completing a round of Prednisone. Plaintiff complained of pain in the knee at a level 6 on a 10-point scale and in the ankle at a level 3 on a 10-point scale with medications. On exam, Plaintiff was noted to be ambulatory, but she had bilateral range of motion deficit of the knee. The left ankle showed swelling. An x-ray of Plaintiff's left ankle revealed minimal soft tissue edema with no fracture or malalignment. An x-ray of her right knee that same day revealed mild osteoarthritis and moderate joint effusion.

Plaintiff saw Dr. Shelton on May 11, 2016, for joint pain, which she reported at a level 8 on a 10-point scale. Dr. Shelton noted Plaintiff to have swelling bilaterally in the hands and feet and the right knee and left elbow. She had full range of motion in all four extremities. Dr. Shelton continued Plaintiff on medications.

On September 19, 2016, Plaintiff was seen for a recheck of medications and complained of worsening of joint pain, including new pain burning in the left upper back. She reported she felt her inflammation was worsening. Dr. Shelton observed Plaintiff to have bilateral hand, feet, and right knee swelling, as well as left elbow swelling from rheumatoid arthritis, but reported Plaintiff had full range of motion in all four extremities. Dr. Shelton continued Plaintiff on medications.

Plaintiff underwent an x-ray of her cervical spine on March 17, 2017, which revealed degenerative disc disease and degenerative joint disease at C5-C6, and an x-ray of her lumbar spine on that same date, which revealed degenerative disc disease and degenerative joint disease.

On April 14, 2017, Plaintiff underwent an MRI of her cervical spine, which revealed endplate changes at the C5-C6 and C6-C7 levels, a large central disk extrusion at the C4-C5 level that was causing mild canal and mild bilateral foraminal compromise, a broad-based disc bulging and spurring at C5-C6 causing a mild degree of right foraminal narrowing, and no significant left foraminal or canal narrowing. (R. at 57.)

Dr. Shelton completed a residual functional capacity evaluation form on March 24, 2017, in which she opined that Plaintiff meets Listing 14.09. (R. at 489.) She indicated Plaintiff has rheumatoid arthritis and chronic pain for which her prognosis was "fair to poor." (R. at 491.) Dr. Shelton indicated that Plaintiff has reduced range of motion, muscle weakness, muscle

atrophy, muscle spasm, abnormal gait, fatigue, sensory changes, swelling, joint warmth, joint deformity + instability, tenderness, reduced grip strength and impaired sleep. She opined that Plaintiff can sit for one hour at a time, that she can stand for thirty minutes at a time, and that she can sit, stand, and walk less than two hours in an 8-hour work day. She opined that Plaintiff can only occasionally carry less than 10 pounds and rarely 10 pounds; that she can occasionally twist and bend but rarely climb stairs; that she would need to take unscheduled breaks every hour; that her legs should be elevated every 2 hours in an 8-hour work day; that she must use a cane or other assistive device to stand and walk; that her pain frequently interferes with her attention and concentration; and that she would need to be absent from work four or more days per month.

### 2. Dr. Jason A. Reed

On October 24, 2016, Plaintiff visited Dr. Jason A. Reed of Joint Implant Surgeons for an evaluation of her right knee following an injury to the knee in late August. Plaintiff complained of constant, moderate pain, swelling, popping, stiffness and instability for three months. She reported she had been receiving outside treatment of ice and heat applications, prescription pain medication, and home care. Dr. Reed noted that Plaintiff performs activities of daily living, including being able to ascend and descend stairs without assistance of the railing. On exam, Dr. Reed observed that an x-ray showed moderate right knee osteophyte formation and joint space narrowing. He noted that no assistive devices were being used for ambulation. Dr. Reed discussed treatment options with Plaintiff and recommended an MRI of her right knee.

Plaintiff saw Dr. Reed again on December 19, 2016, for follow up, with continued complaints of frequent, moderate pain, swelling, locking, catching and stiffness of the right knee. Dr. Reed noted that Plaintiff was not using assistive devices for ambulation. Dr. Reed

recommended that Plaintiff undergo an MRI of her right knee to rule out a meniscus tear.

Plaintiff saw Dr. Reed again on January 6, 2017, following an MRI that revealed a right knee lateral meniscus tear, severe synovitis, and severe osteoarthritis. Plaintiff complained that her pain was interfering with daily activities and sleep. Plaintiff decided to undergo a right total knee arthroplasty. Plaintiff underwent a right total knee arthroplasty performed by Dr. Reed on February 2, 2017.

## B.    State Agency Physicians

### 1.   Consultative Examiner, Dr. Parsley

On December 30, 2014, Plaintiff was examined by Deidre Parsley, D.O., at the request of the state agency. Plaintiff reported that she experiences back pain, rheumatoid arthritis, degenerative disc disease, and neuropathy of the hands and feet. (R. at 281.) She stated she was diagnosed with rheumatoid arthritis in 2005, which she alleged causes stiffness of the joints in her hands, knees, and feet that is worse in the mornings and that seems to get better as the day goes on. She reported the pain as constant. She indicated the pain in her hands is worse with driving, and the pain in the knees and feet is worse with prolonged sitting and standing. She stated that her joints have never been aspirated or injected. She reported having had surgery to remove the bursa and rheumatoid nodule from both elbows.

Plaintiff further reported chronic numbness in her fingertips and toes and "some mild decreased grip strength bilaterally" following a severe reaction to Remicade, a medication she was prescribed to treat rheumatoid arthritis. (R. at 281.) Plaintiff also alleged back pain and degenerative disc disease. She reported that the pain is located in the low back, which radiates into the hips and the neck and is constant. She reported numbness and tingling of the arms and

weakness in her hand. She rated her pain to be a 5 out of 10 at its best and a 10 out of 10 at its worst. (R. at 282.) Plaintiff reported that the pain worsens with sitting more than two hours, standing more than half an hour, or walking more than an hour. She stated that she is unable to lift and carry due to rheumatoid arthritis of the hands and knees. The examiner noted that Plaintiff had not had a recent EMG/MVC study, and that she has not had physical therapy, chiropractic treatment, spinal injections, or neck or back surgery. She takes medication for pain.

On examination, Dr. Parsley observed that Plaintiff "ambulates with a right limp that is not unsteady," but noted she "does not require a handheld assistive device." (R. at 284.) He further reported that Plaintiff "appears stable and comfortable in the supine and sitting positions." (*Id.*) He observed that Plaintiff's "shoulders, elbows and wrists are non-tender," though there was "swelling of the bilateral elbows" and an "enlargement noted of the bilateral elbows likely secondary to rheumatoid arthritis." (*Id.*) Dr. Parsley further reported that "[e]xamination of the hands reveals tenderness, redness, and swelling of the bilateral MCP and PIP joints," with "no warmth noted" and "atrophy of the right thenar eminence." (*Id.*) Plaintiff was able to make a fist and her grip strength measured 8, 8, and 8kg of force on the right and 6, 8, and 8 kg of force on the left and 3.5/5 grip strength upon squeezing with the right hand and 4/5 with the left. Dr. Parsley observed that Plaintiff was able to write and pickup coins with either hand without difficulty and that her range of motion of the joints of the fingers of both hands was normal. (R. at 285.)

Upon examining Plaintiff's legs, Dr. Parsley reported that there was "no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet, with the exception of tenderness of the anterior knees, swelling of the knees, and swelling of the bilateral ankles

which are worse on the right." (*Id.*) He noted "rheumatoid nodules [] of the left leg great toe and the right 5th toe." (*Id.*) Examination of the cervical spine revealed "no tenderness over the spinous processes [or] evidence of paravertebral muscle spasms." (*Id.*) In addition, Dr. Parsley reported that "[e]xamination of the dorsolumbar spine reveals normal curvature," with "no evidence of parabertebral muscle spasm" and "no tenderness to percussion of the dorsolumbar spinous processes." (*Id.*) A straight-leg test performed in the sitting and supine position was normal. Dr. Parsley observed that Plaintiff "is able to stand on one leg at a time without difficulty," and that there was "no hip joint tenderness, redness, warmth, swelling or crepitus." (*Id.*)

Dr. Parsley's impression was that Plaintiff has a history of osteoarthritis; paresthesia of the hands and feet; chronic cervicalgia; and chronic lumbalgia; and he also noted the existence of x-ray evidence of degenerative disc disease at L5-S1; x-ray evidence of bilateral calcaneal spurs; and MRI evidence of intermetatarsal neuroma and bursitis of the left foot. (R. at 286.) Dr. Parsley noted that Plaintiff had swelling of both wrists and deformity of the wrists most likely secondary to rheumatoid arthritis, along with tenderness, redness, and swelling of the hands. (R. at 286.) Dr. Parsley observed, however, that fine manipulation was well preserved bilaterally. He further observed full range of motion of the joints of the hands with the exception of the left PIP joint which was limited in extension to 10 degrees. Dr. Parsley observed tenderness of the anterior knees and swelling of the knees, swelling of both ankles worse on the right, difficulty with balance, and an inability to walk on the heels or toes or squat. In addition, Dr. Parsley observed decreased range of motion of the left elbow and bilateral wrists and bilateral knees and bilateral ankles, consistent with rheumatoid arthritis.

As for the cervicalgia and lumbalgia, Dr. Parsley noted that Plaintiff's sensation was intact except for decreased sensation of the feet but noted that deep tendon reflexes were normal. Plaintiff demonstrated decreased range of motion of the cervical and dorsolumbar spine. Plaintiff was noted to have decreased sensation to pinprick and light touch on the feet but her deep tendon reflexes were normal and her muscle tone was good.

Ultimately, Dr. Parsley opined that Plaintiff's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be at least moderately to severely impaired due to the objective findings described above."  (R. at 287.)

### 2.  State Agency Reviewing Physician, Dr. Villanueva

On May 4, 2015, Esberdado Villanueva, M.D., reviewed Plaintiff's medical records. Based upon that review, Dr. Villanueva opined that Plaintiff is limited to carrying 10 pounds occasionally; to standing or walking for 4 hours of the day; to sitting 6 hours in an 8-hour work day; and that she was limited in her ability to push and pull in the upper and lower extremities in that she could only occasionally operate foot controls and frequently push and pull hand controls with both upper extremities; that she could occasionally climb ramps and stairs; that she could never climb ladders, ropes, or scaffolds, and frequently balance, stoop, kneel and crawl; and that she could only occasionally crouch.  Dr. Villanueva opined that these limitations were due to symptoms of rheumatoid arthritis, and also noted that because of a decreased sensation to her feet, Plaintiff should never climb ladders, ropes or scaffolds.  (R. at 96.)  He further opined that Plaintiff is limited in her ability to perform hand handling due to atrophy and swelling in the hands secondary to rheumatoid arthritis, and that she should avoid hazards due to neuropathy.

## C.    The ALJ's Decision

On April 28, 2017, the ALJ issued his decision.  (R. at 15-24.)  At step one of the

sequential evaluation process,[1] the ALJ found that Plaintiff has not engaged in substantial gainful

activity since November 14, 2013.  (R. at 17.)  The ALJ found that Plaintiff has the severe

impairments of rheumatoid arthritis, degenerative joint disease of the knees, status post right

total knee replacement; mild degenerative disc disease of the cervical and lumbar spine; and

degenerative joint disease of the bilateral hands and left foot.  (*Id.*)  He further found that

Plaintiff did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(R. at 15.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the

---

1.  Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal
   the criteria of an impairment set forth in the Commissioner's Listing of
   Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant
   perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual
   functional capacity, can the claimant perform other work available in the
   national economy?

*See* 20 C.F.R. § 416.920(a)(4); see also *Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) and 416.967(a) except for the following limitations. The claimant can stand or walk four hours at an eight-hour workday, and can sit for six hours of an eight-hour workday. The claimant can frequently push or pull, or operate hand controls with the bilateral upper extremities. The claimant can occasionally operate foot controls with the bilateral lower extremities. The claimant can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds. The claimant can frequently balance, stoop, or kneel; can occasionally crouch; and can frequently crawl. The claimant can frequently handle or finger bilaterally. The clamant must avoid concentrated exposure to extreme cold. The claimant must avoid all exposure to hazards such as unprotected heights, moving machinery, or commercial driving.

(R. at 19.) Relying on testimony from a vocational expert, the ALJ found that Plaintiff is able to perform past relevant work as a check cashier. (R. at 23.) The ALJ therefore concluded that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Social Security Act. (R. at 24.)

### III.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IV.   ANALYSIS

Plaintiff contends that remand is proper because (1) the ALJ failed to find that Plaintiff had a severe impairment as a result of swelling and pain in the right foot and elbow; (2) the ALJ failed to appropriately weigh the medical source opinions; and (3) the ALJ's decision is not supported by substantial evidence. The undersigned finds these contentions of error to be without merit, for the reasons discussed below.

**A.   Severe Impairment Related to Foot and Elbow Conditions**

Plaintiff contends that the ALJ erred in failing to find Plaintiff had a severe impairment due to pain and swelling in the right foot and elbow. At step two of the sequential evaluation process, Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment that meets the twelve-month durational requirement. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803-

04 (6th Cir. 2012). The United States Court of Appeals for the Sixth Circuit has construed a claimant's burden at step two as "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The inquiry is therefore "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 863 (quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985).

Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

Here, because the ALJ determined that Plaintiff has several severe impairments at step two of the sequential analysis, the question is whether the ALJ appropriately considered any limiting effects caused by Plaintiff's foot and elbow pain and swelling in assessing Plaintiff's RFC. The undersigned concludes that he did. The RFC assessed by the ALJ includes limitations on Plaintiff's ability to stand; walk; climb ramps, stairs, ropes and scaffolds; crouch; and operate foot controls, among other things. (R. at 19.) In imposing these limitations, the ALJ considered

Plaintiff's allegations concerning her feet and elbows. For example, the ALJ acknowledged Plaintiff's allegations of daily pain that she claims limits her ability to use her upper extremities. (R. at 20.) He also acknowledged that Plaintiff reported difficulty standing and walking due to foot pain. The ALJ explicitly considered medical records documenting degenerative changes in the feet, including an MRI of Plaintiff's right foot that revealed fluid collection within the sheath. *Id.* (citing Exs. 3F and 10F.) Plaintiff subsequently received injections to treat cystic lesions in that foot. The ALJ also considered Plaintiff's May 25, 2015 trip to an urgent care facility at Holzer Clinic with complaints of foot pain. (R. at 21.) In addition, the ALJ expressly acknowledged that Plaintiff's "treatment throughout 2014 was primarily focused on right foot and bilateral elbow pain." (R. at 21.)

Ultimately, the ALJ concluded that Plaintiff's foot and elbow pain caused limitations consistent with the RFC he assessed. As for Plaintiff's elbow, the ALJ stated that Plaintiff "underwent excision of rheumatoid nodules and reported significant relief of pain from that procedure." (R. at 21.) The ALJ pointed out that until Plaintiff's May 25, 2015 urgent care visit for foot pain, "[t]here was no evidence of treatment at or around the time of the alleged onset in November 2013." (R. at 21.) The ALJ also pointed out that although a failed treatment "caused lasting neurological symptoms including . . . neuropathy" first confirmed on an EMG and nerve conduction study in 2007, "there were no subsequent studies demonstrating further changes in the extremities." (R. at 21.) In addition, the ALJ emphasized that Plaintiff "was able to work for several years after the onset of her medication-induced neuropathy in a job requiring medium exertion levels setting up merchandise displays, suggesting those changes were not as limiting as she currently reports." (R. at 21.)

18

The ALJ also pointed out that in October 2014 Plaintiff reported improvement in symptoms related to her feet, including a report of no pain when walking.  (R. at 21.)  He also noted that Plaintiff "routinely reported relatively mild or moderate pain levels throughout 2014, generally between a 2 and a 5 on a 10-point scale.  The ALJ emphasized that throughout 2014 Plaintiff consistently presented in no acute distress and that physical examination findings generally failed to demonstrate motor, neurological, or gait deficits, as well as that Plaintiff retained full range of motion and had no edema.  (R. at 21.)  Although the ALJ recognized that Plaintiff reported subjective increases in pain in 2015 and 2016, he noted that Plaintiff's treatment remained very conservative in nature during this period and occurred at very routine intervals.  (R. at 21.)  He pointed out that Plaintiff saw her primary care physician only three times in 2015, and she "received no treatment from specialists, suggestive of symptoms that were well-controlled with routine outpatient treatment."  (R. at 21.)  Ultimately, the ALJ's analysis of this evidence, combined with Plaintiff's ability to perform activities of daily living independently without assistance and other record evidence, led the ALJ to reasonably conclude that Plaintiff's allegations regarding the intensity of her foot and elbow pain are not supported by the record. *See* R. at 21 (concluding that the "record fails to demonstrate evidence of persistent pain levels or other symptoms" to the extent alleged by Plaintiff).

In light of the ALJ's thorough analysis related to Plaintiff's foot and elbow symptoms, the undersigned rejects Plaintiff's assertion that the ALJ made "no attempt [] to examine and evaluate the impact of [Plaintiff's] right foot or elbow impairments" in assessing Plaintiff's RFC. (SOE at 11, ECF No. 15.)   Finding no error in the ALJ's analysis regarding Plaintiff's right foot

and elbow conditions, the undersigned **RECOMMENDS** that Plaintiff's first contention of error be **OVERRULED**.

**B.     Weighing of Medical Source Opinions**

Plaintiff next contends that the ALJ erred in weighing the medical source opinions of record.  The undersigned disagrees.  The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  The applicable regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(1); *see also* SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.").

Like other medical source opinions, the ALJ must consider state agency medical opinions.  *See* 20 C.F.R. § 416.913a(b)(1) ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996) (administrative law judges are required to consider state agency medical "findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists.  Administrative law judges and Appeals Council are not bound by findings made by State agency . . . but they *may not ignore these opinions* and must explain the weight given to the opinions in

their decisions.") (emphasis added).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id.* Further, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth

Circuit has stressed the importance of the good-reason requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

"In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, *3; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (state-agency medical consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act;" thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating . . . source." (first alteration in original) (internal quotation marks omitted)); *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency medical consultants

are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence.").

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, Plaintiff asserts that the ALJ erred in weighing the opinions of Drs. Shelton and Parsley. The undersigned disagrees. The ALJ declined to assign controlling weight to the functional capacity questionnaire completed by Dr. Shelton and provided good reasons for doing so. First, the ALJ noted that although Dr. Shelton stated in that form that Plaintiff requires a cane for walking, "the evidence as a whole fails to demonstrate that [Plaintiff] had an inability to ambulate effectively or required a hand-held assistive device." (R. at 21.) As the ALJ pointed out, Plaintiff testified that she used a cane for approximately eight weeks prior to the administrative hearing, but "she reported that this has been in her acute recovery from knee surgery." (R. at 21.) The ALJ cited other treatment records noting that Plaintiff ambulates effectively and found that the "weight of the evidence fails to corroborate Dr. Shelton's observation in her March 2017 checklist that the claimant requires a cane for walking distances." (R. at 22.) Furthermore, the ALJ determined that Dr. Shelton's remaining opinions regarding Plaintiff's physical limitations "were inconsistent with the evidence, including [Dr. Shelton's] own progress notes." (R. at 22.) As the ALJ emphasized, Dr. Shelton's records failed to demonstrate an "inability to ambulate effectively or perform gross and fine movements

effectively," contrary to Dr. Shelton's opinion.  (R. at 22.)  The ALJ similarly noted the lack of "complaints of severe fatigue, fever, malaise, or involuntary weight loss," which are criteria of listing 14.09, despite Dr. Shelton's opinion that Plaintiff meets that listing.[2]  (R. at 22.)  In addition, the ALJ noted that Dr. Shelton has treated Plaintiff conservatively and at routine intervals, which is inconsistent with the limitations set forth in her opinion.  Ultimately, the ALJ acknowledged that "Dr. Shelton offered this opinion in March 2017 as [Plaintiff] was recovering from her February 2017 knee replacement, so it may have represented [Plaintiff's] acute functioning during that recovery period rather than her baseline functioning" for the period under consideration.  (R. at 22.)  The undersigned finds no error in the ALJ's analysis or weighing of Dr. Shelton's opinion.

The undersigned likewise finds no error in the ALJ's consideration and weighing of Dr. Parsley's opinion.  The ALJ analyzed Dr. Parsley's opinion as follows:

> The undersigned also gives little weight to the opinion of the consultative examining physician, Dr. Parsley, who opined 'the claimant's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be at least moderately to severely limited due to the objective findings described above.' (Exhibit 2F, p.7.) Those objective findings referred to decreased sensation to pinprick and light touch of the feet, and some demonstrated difficulty with balance.  Still, deep tendon reflexes were normal and muscle tone was good.  There was no tremor or clonus.  The claimant's grip strength was somewhat decreased, with 3.5/5 on the right and 4/5 on the left, but still she was able to pick up a coin a and write with no limitations.  (Exhibit 2F, p. 8-9.)  This opinion was non-specific regarding the claimant's maximum work-related abilities, and the assessment of 'severe' limitations is inconsistent with the findings of good retained strength, ability to manipulate small objects despite her arthritic changes in her upper extremities, and ability to walk without the aid of an assistive device.

---

[2] Plaintiff does not contend that the ALJ erred in finding Plaintiff does not meet listing 14.09. Dr. Shelton's opinion that she did, however, reasonably led the ALJ to accord it less weight given the demonstrable lack of evidence to support a finding that Plaintiff meets that listing.

Further, this assessment of 'severe' limitations is inconsistent with the contemporaneous treatment notes at that time, which demonstrated that she had some generalized pain but physical examinations were relatively unremarkable and she routinely presented without acute distress.

(R. at 22-23.)  The undersigned finds the ALJ's analysis of Dr. Parsley's opinion to be thorough and supported by substantial evidence.

Plaintiff disagrees, arguing that the ALJ erred in failing to expressly consider the factors set forth in 20 CFR § 404.1527 when weighing the opinions of Drs. Shelton and Parsley.  (SOE 16, ECF No. 15.)  The ALJ, however, is not required to explicitly mention each of the criteria found in the regulations.  *See Tilley*, 394 F. App'x at 222 (the ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision); *Prince v. Astrue*, No. 2:10-cv-000008, 2011 WL 1124986, at *4 (S.D. Ohio Mar. 22, 2011) (same).  Plaintiff also takes issue with the ALJ's decision to assign greater weight to Dr. Villanueva, a non-examining source, than he did to Drs. Shelton and Parsley, pointing out that Dr. Villanueva "had no awareness of [Plaintiff's] medical course in the two years which followed" his opinion.  (*Id.* at 17.)  Although Dr. Villanueva did not have the benefit of subsequent treatment notes at the time he rendered his May 4, 2015 opinion, the ALJ did.  The ALJ considered Plaintiff's treatment records from that period and weighed them in a manner that is supported by substantial evidence, as discussed above and below.  It is therefore **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

### C.    The ALJ's Decision is Supported by Substantial Evidence

Finally, the undersigned rejects Plaintiff's contention that the ALJ's decision is not supported by substantial evidence.  As set forth above, the Court must consider whether the ALJ's decision is supported by "substantial evidence," which is "more than a scintilla of

evidence but less than a preponderance," and constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241 (internal quotation marks and citation omitted). "[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal quotation marks and citation omitted).

Here, Plaintiff advances several arguments in an effort to establish that the ALJ's decision is not supported by substantial evidence, none of which is convincing. For example, Plaintiff contends that the ALJ incorrectly found at step two that Plaintiff has only "mild" degenerative disc disease even though a March 2017 x-ray showed "marked" and "severe" narrowing at levels C5-C6 and L5-S1, respectively. (SOE 8-9, ECF No. 15.) As the Commissioner points out, however, the x-ray in question yielded a finding of degenerative disc disease without specifying whether it was mild or severe, and numerous diagnostic tests in the record revealed only mild narrowing or other deformities. (Op. at 9, ECF No. 16.) More importantly, however, the ALJ's characterization of Plaintiff's degenerative disc disease at step two is of little consequence because the ALJ appropriately considered the limiting effects resulting from Plaintiff's degenerative disc disease in assessing Plaintiff's RFC. *See*, *e.g.*, R. at 20 (discussing Plaintiff's allegations of difficulty standing and walking due to back pain); *see also Pompa*, 73 F. App'x at 803. In fact, the ALJ later stated that Plaintiff had "mild to moderate degenerative changes in the . . . cervical and lumbar spine," and went on to acknowledge that "[t]he evidence clearly documents some degenerative and inflammatory changes of the . . . spine that would restrict the claimant's ability to lift and carry more than very light objects, as well as

would limit her ability to stand and walk for prolonged periods." (R. at 20.) Ultimately, the ALJ concluded that "the record fails to demonstrate evidence of persistent pain levels or other symptoms that would preclude the above range of full-time sedentary work." (R. at 20.) Because the ALJ appropriately considered any limiting effects from Plaintiff's spine condition when assessing Plaintiff's RFC, his characterization of the severity of Plaintiff's disc disease at step two does not render his opinion unsupported by substantial evidence.

Plaintiff also maintains that the ALJ indicated Plaintiff's hand and foot impairments were caused by "degenerative joint disease" rather than osteoarthritis and rheumatoid arthritis. (SOE 9, ECF No. 15.) The Commissioner counters that degenerative joint disease is also known in the medical community as osteoarthritis, citing the American Academy of Physical Medicine and Rehabilitation in support. (Op. 7, ECF No. 16.) In her Reply, Plaintiff contends that degenerative joint disease is not synonymous with rheumatoid arthritis and insists the ALJ's "misunderstanding" regarding the difference between degenerative joint disease and rheumatoid arthritis is "significant" because it "suggests that the ALJ . . . presumed him to have an understanding of the impairments about which he was speaking." (Reply 3, ECF No. 19.) The undersigned need not resolve whether the term "degenerative joint disease" is interchangeable with "rheumatoid arthritist" or "osteoarthritis," however, because the ALJ appropriately considered limitations resulting from Plaintiff's hand and foot impairments in assessing her RFC, as set forth in Section IV.A. above.

Plaintiff also contends that the ALJ only cited evidence that favors a finding of non-disability while ignoring evidence that supports Plaintiff's allegations. For example, Plaintiff points to various medical records that document complaints of pain and swelling in the hands

27

and contends that "[n]one of the physical findings [in those records] was found in the ALJ's rendition of the evidence in which he found [Plaintiff's] pain complaints [regarding her hands] were 'inconsistent'" with the record. (SOE 13-14, ECF No. 15.) Plaintiff also takes issue with the ALJ's failure to explicitly mention certain findings set forth in Dr. Parsley's opinion. (SOE 14, ECF No. 15.) She also takes issue with the ALJ's conclusion that Dr. Parsley's opinion is inconsistent with contemporaneous treatment notes, pointing out that she treated with Dr. Shelton within a week of seeing Dr. Parsley and had complaints of pain at a level 8 on a 10-point scale during that visit. (Reply 6, ECF No. 19.) It is well established, however, that an ALJ is not required to "discuss every piece of evidence in the record to substantiate [his] decision." *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)). Effectively, Plaintiff accuses the ALJ of cherry picking the evidence to support his conclusions. Such a contention "is seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

Finally, the ALJ considered the record as a whole, and his conclusions are supported by substantial evidence. For example, the ALJ thoroughly considered records pertaining to Plaintiff's foot and elbow symptoms, as discussed in Section IV.A. above, and the opinions of Drs. Shelton and Parsley, as discussed in Section IV.B. above. The ALJ observed that Plaintiff experiences degenerative and inflammatory changes of the joint and spine and considered objective findings such as diagnostic imaging and blood panel results. (R. at 20.) Ultimately,

the ALJ concluded that the evidence is "inconsistent with disabling pain levels" as alleged by Plaintiff. The ALJ reached this conclusion based on the lack of treatment between November 2013, when Plaintiff alleges she became disabled, and May 25, 2015. (R. at 21.) He also cited the fact that Plaintiff "was able to work for several years after the onset of her medication-induced neuropathy, in a job requiring medium exertion levels setting up merchandize displays, suggesting that those changes were not as limiting as she currently reports." (R. at 21.) The ALJ pointed out that Plaintiff generally reported mild or moderate pain levels throughout 2014; that she reported improved symptoms with no pain on walking at an October 1, 2014 medical appointment; that she "consistently presented in no acute distress" with examination findings that "did not demonstrate significant motor, neurological or gait deficits"; and that she generally "retained full range of motion and had no edema." (R. at 21.) The ALJ further emphasized that Plaintiff treated only conservatively and at routine intervals throughout 2015 and 2016, "suggestive of symptoms that were well-controlled with routine outpatient treatment." (R. at 21.) The ALJ acknowledged that Plaintiff underwent a total knee arthroplasty in February 2017, but observed that the need to do so arose acutely from an injury and that "subsequent treatment notes demonstrated unremarkable post-operative." (R. at 21.) The ALJ also considered Dr. Villanueva's opinion, in which he found Plaintiff is capable of performing a range of "sedentary exertional activities with reduced postural and manipulative functioning," and concluded that this "opinion is consistent with the weight of the evidence." (R. at 23.) The ALJ also reasonably considered Plaintiff's activities of daily living in assessing her credibility regarding the intensity and frequency of her pain. *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d

387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain.").  The ALJ emphasized that Plaintiff "continued to be able to carry out her activities of daily living independently without assistance," and that she even traveled to Canada for vacation in July 2015, "suggesting she was capable of sitting for prolonged periods to travel."  (R. at 22.)  In light of this thorough analysis of the record, the undersigned rejects Plaintiff's contention that the ALJ's decision is not supported by substantial evidence.

Accordingly, it is **RECOMMENDED** that Plaintiff's third contention of error be **OVERRULED**.

## V.    CONCLUSION

In sum, from a review of the record as a whole, the undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VI.    PROCEDURE ON OBJECTIONS

If Plaintiff seeks review by the District Judge of this Report and Recommendation, he may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

Plaintiff is specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED**.

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE